1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  DARREN J. ROBBINS (168593)
   TRAVIS E. DOWNS III (148274)
3  BENNY C. GOODMAN III (211302)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   darrenr@rgrdlaw.com
6  travisd@rgrdlaw.com
   bennyg@rgrdlaw.com
7
   GLANCY BINKOW & GOLDBERG LLP
8  MICHAEL GOLDBERG (188669)
   1801 Avenue of the Stars, Suite 311
9  Los Angeles, CA  90067
   Telephone:  310/201-9150
10 310/201-9160 (fax)
   mgoldberg@glancylaw.com
11
   Lead Counsel for Plaintiffs
12
                   UNITED STATES DISTRICT COURT
13
                 CENTRAL DISTRICT OF CALIFORNIA
14
                        SOUTHERN DIVISION
15
   In re STEC, INC. DERIVATIVE      )  Master File No.
16 LITIGATION                       )     CV10-00667-JVS(MLGx)
                                    )
17 ─────────────────────────────────)  CONSOLIDATED VERIFIED
   This Document Relates To:         )  SHAREHOLDER DERIVATIVE
18                                   )  COMPLAINT FOR BREACH OF
        ALL ACTIONS.                 )  FIDUCIARY DUTY
19 ─────────────────────────────────)
                                       DEMAND FOR JURY TRIAL
20

21

22

23

24

25

26

27

28

524368_1

## NATURE OF THE ACTION

1.     This is a shareholder derivative action on behalf of nominal defendant STEC, Inc. ("STEC" or the "Company") against its entire Board of Directors (the "Board") and certain top officers for breach of fiduciary duties, corporate waste, unjust enrichment, and insider trading.  Defendants include: Manouch Moshayedi, Mark Moshayedi, Dan Moses, Matthew L. Witte, Rajat Bahri, F. Michael Ball, Christopher W. Colpitts and Raymond D. Cook.

2.     STEC designs and sells custom memory solutions based on flash memory and dynamic random access memory ("DRAM") technologies.   One of the Company's primary products is a solid-state disk drive ("SSD") that stores electronic information like a traditional Hard Disk Drive ("HDD"), but unlike an HDD, has no moving parts.  SSDs recently gained notoriety when they were included as a top-end option in Apple's ultra-portable laptop computer.  STEC's primary competition is from companies that produce NAND flash memory – like the memory used in many popular portable music players.

3.     STEC once had the SSD market to itself.  Beginning on June 16, 2009, defendants caused STEC to issue materially false and misleading statements regarding STEC's customers, its competitive position and its prospects.   The Company specifically failed to disclose looming threats of competition from other technology companies, such that STEC would not be the only company to gain design wins, thereby cornering the lion's share of the SSD market. Defendants misrepresented that STEC had no competition in that market and assured shareholders that enterprise end users were quickly adopting SSD devices over traditional HDD devices.  In truth, as early as July 2, 2009, defendants were aware of, yet deliberately disregarded, actual competition that would likely soon enter the market.

4.     Defendants further misrepresented the Company's agreement with its largest customer, EMC Corporation ("EMC"), to purchase $120 million of its flagship product, ZeusIOPS, as indicative of future SSD sales and growth.

1

524368_1

5.   Defendants' false and misleading statements caused STEC stock to trade at artificially inflated prices during the Relevant Time Period (June 16, 2009 to February 23, 2010), reaching a high of $41.84 per share on September 10, 2009. This inflated stock price permitted top STEC officers/directors to sell 9 million shares of their STEC stock in an August 2009 secondary stock offering, reaping over $267 million in illegal insider trading profits. The shares sold were, collectively, more than 11 times the number of shares sold by such top STEC officers/directors in the six months before the Relevant Time Period and 20 times the number of shares they sold in all of 2008. The trading was highly suspect in both volume and timing.

6.   Defendants' subterfuge was partially revealed on September 17, 2009, when an analyst report leaked information that one of STEC's top customers was working closely with Toshiba – a major HDD manufacturer – and was in the final qualification stages for SSDs. Moreover, according to this report, another leading HDD company had begun sampling an enterprise SSD and was likely to introduce a Single Level Cell ("SLC") Serial Advanced Technology Attachment ("SATA")/SAS SSD and possibly a Multi-Level-Cell SSD drive in the fourth quarter, presenting an additional competitive threat to STEC and its business.

7.   On this news, STEC's stock price collapsed $6.37 per share – instantly wiping out over $300 million in shareholders' equity.

8.   Just as shareholders were digesting these material adverse facts, on November 3, 2009, STEC announced that its largest customer, EMC, which accounted for 90% of the STEC's ZeusIOPS-branded SSD business, would carry 2009 inventory into 2010 which would have a negative impact on the Company's first quarter 2010. In other words, EMC would not be placing many new orders in early 2010. Defendants intentionally oversupplied EMC with faulty products, foreclosing the prospect of future commitments from EMC.

9.   On this news, STEC's stock plunged $9.01 per share – instantly wiping out another $450 million of shareholders' equity.

524368_1

2

10. On February 23, 2010, STEC stunned shareholders by reporting the inventory carry-over at EMC would not only hurt STEC's first quarter 2010 revenues, but that it would also negatively impact STEC's sales for the entire first half of 2010. On this news, STEC stock collapsed again, instantly wiping out an additional $160 million in shareholders' equity. In total, as a result of defendants' breaches of fiduciary duty, $750 million of STEC shareholders' equity has been destroyed.

11. Defendants' malfeasance has exposed STEC to a costly investigation by the Securities and Exchange Commission ("SEC") for potential violations of the federal securities laws. Additionally, certain STEC executives, including defendants Manouch and Mark Moshayedi, have received subpoenas in connection with the SEC's investigation. Defendants' wrongdoing also caused the Company to be named as a defendant in a costly and expensive to defendants securities class action lawsuit entitled *In re STEC, Inc. Securities Litigation*, Case No. SACV 09-01304-JVS (MLGx), in the Central District of California.

12. While STEC has been severely injured by defendants' misconduct, defendants have not fared nearly so badly. While STEC stock traded at artificially inflated prices, defendants Manouch and Mark Moshayedi sold 9 million shares of STEC common stock in a secondary public offering, for unlawful insider trading proceeds exceeding $267 million.

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. §1332(a)(2), as plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so

524368_1

1   as to render the exercise of jurisdiction by the District courts permissible under

2   traditional notions of fair play and substantial justice.

3        15.   Venue is proper in this Court under 28 U.S.C. §1391(a) because:

4   (i) STEC maintains its principal place of business in this District; (ii) one or more of

5   the defendants either reside in, or maintain executive offices in, this District; (iii) a

6   substantial portion of the transactions and wrongs complained of herein, including the

7   defendants' primary participation in the wrongful acts detailed herein, and aiding and

8   abetting and conspiracy in violation of fiduciary duties owed to STEC, occurred in

9   this District; and (iv) defendants have received substantial compensation in this

10  District by doing business here and engaging in numerous activities that had an effect

11  in this District.

12  **PARTIES**

13       16.   Plaintiff Building Trades United Pension Trust Fund ("Building Trades")

14  has continuously held shares of STEC since August 2008. Building Trades' principal

15  offices are located at 500 Elm Grove Road, Elm Grove, Wisconsin 53122.

16       17.   Plaintiff Emilio Gerov is a resident of Venezuela and has continuously

17  held shares of STEC during the Relevant Time Period.   Specifically, he has

18  continuously held his shares since October 2009.

19       18.   Nominal Party STEC is a California corporation with its headquarters

20  and principle executive offices located at 3001 Daimler Street, Santa Ana, California

21  92705.

22       19.   Defendant Manouch Moshayedi, co-founder of STEC, is, and has been,

23  Chairman of the Board and Chief Executive Officer ("CEO") of STEC since March

24  1990. From March 1990 until September 1994, Manouch Moshayedi acted as STEC's

25  Chief Financial Officer ("CFO"). Manouch Moshayedi sold 4.5 million shares of his

26  STEC stock for illegal insider trading proceeds of nearly $134 million.  Manouch

27  Moshayedi resides at 2121 Bayside Drive, Corona Del Mar, CA 92625.

28

524368_1

4

20.    Defendant Mark Moshayedi is and has been Chief Operating Officer ("COO"), Chief Technical Officer, and Secretary of STEC since January 1995 and a director since March 1992. Defendant Mark Moshayedi served as STEC's President since March 2007 and from June 1994 to December 1994 served as STEC's President of Research and Development.  Mark Moshayedi and Manouch Moshayedi are brothers.  Mark Moshayedi sold 4.5 million shares of his STEC stock for illegal insider trading proceeds of nearly $134 million.  Mark Moshayedi resides at 14 Channel VIS, Newport Coast, CA 92657.

21.    Defendant Dan Moses ("Moses") has been a STEC director since March 2000.  From October 1992 to August 1994, defendant Moses served as STEC's controller; from August 1994 to November 2008 he was STEC's CFO; and from August 2006 to November 2008 he was STEC's Executive Vice President. Defendant Moses resides at 1251 Dodge City Place, Norco, CA 92860.

22.    Defendant Matthew L. Witte ("Witte") has been a STEC director since January 2009. Witte is also a member of the Audit, Compensation, and Nominating and Corporate Governance Committees.  Defendant Witte resides at 31541 Table Rock Drive, Laguna Beach, CA 92651.

23.    Defendant Rajat Bahri ("Bahri") has been a STEC director since November 2005.  Bahri is also a member of the Audit, Compensation, and Nominating and Corporate Governance Committees.  Defendant Bahri resides at 11121 Magdalena Road, Los Altos Hills, CA 94024.

24.    Defendant F. Michael Ball ("Ball") has been a STEC director since October 2000.  Ball is also a member of the Audit and Compensation Committees. Defendant Ball resides at 215 Larkspur Avenue, Corona Del Mar, CA 92625.

25.    Defendant Christopher W. Colpitts ("Colpitts") has been a STEC director since March 2009.  Defendant Colpitts resides at 125 Belgrave Avenue, San Francisco, CA 94117.

524368_1

1    26.    Defendant Raymond D. Cook ("Cook") is, and has been, CFO of STEC
2  since November 2008.  Defendant Cook resides at 5291 Glenroy Drive, Huntington
3  Beach, CA 92649.

### DEFENDANTS' FIDUCIARY DUTIES

5    27.    Each officer and director of STEC owed STEC or its shareholders the
6  duty to exercise a high degree of candor, good faith and loyalty in the management
7  and administration of the affairs of the Company, as well as in the use and
8  preservation of its property and assets.  The conduct of STEC's directors and officers
9  complained of herein involves a knowing, intentional and culpable violation of their
10 obligations as directors and officers of STEC and the absence of good faith on their
11 part as to their duties to the Company and its shareholders.  The misconduct of
12 STEC's officers has been ratified by STEC's Board, which has failed to take any legal
13 action on behalf of the Company against them.

14   28.    By reason of their positions as fiduciaries of STEC and because of their
15 ability to control the business and corporate affairs of STEC, defendants were required
16 to use their ability to control and manage the Company in a honest and lawful manner,
17 and to act in the best interests of STEC, and not in favor of their personal interests or
18 benefit.  In addition, as officers and/or directors of STEC, defendants had a duty to
19 promptly disseminate accurate and truthful information with respect to the Company's
20 operations, projections and forecasts, so as to fulfill their duty of candor and good
21 faith to STEC.

22   29.    Defendants, because of their positions of control and authority as
23 directors and/or officers of STEC, were able to and did, directly and indirectly, control
24 the wrongful acts complained of herein.  Because of their executive and directorial
25 positions with STEC, each of the defendants had access to adverse, non-public
26 information about the financial condition, operations, and future business prospects of
27 STEC and was required to disclose it promptly and accurately to the Company's
28 shareholders and the financial markets, but did not do so.

6

524368_1

30.   To discharge their fiduciary duties, defendants were required to exercise candor, good faith and loyalty in the management, policies, practices and controls of the business and financial affairs of STEC. By virtue of such duties, the officers and directors of STEC were required, among other things, to:

(a)   Manage, conduct, supervise and direct the business affairs of STEC in accordance with the law (including U.S. securities laws and the Sarbanes-Oxley Act of 2002), government rules and regulations and STEC's charter and bylaws;

(b)   Neither violate nor knowingly permit any officer, director or employee of STEC to violate applicable laws, rules and regulations;

(c)   Remain informed as to the status of STEC's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with their duty of candor to the Company's shareholders; and

(d)   Maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that STEC's financial statements would be accurate and the actions of its directors would be in accordance with all applicable laws.

31.   Defendants, and each of them, occupied a position with STEC or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning STEC and its operations, finances and financial condition. Because of these positions and such access, defendants, and each of them, knew that the true facts specified herein regarding STEC's business and finances had not been disclosed to, and were being concealed from, its shareholders and the public. Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material, adverse information regarding STEC and to take any and all action necessary to ensure that the officers and directors of

STEC did not act upon such privileged non-public information in a manner that caused the Company to violate the law.

32.    Defendants breached their duties of candor, loyalty and good faith by allowing, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent defendants from taking such illegal actions. Defendants, and each of them, caused STEC to issue false and/or misleading statements and financial reports to STEC shareholders and the SEC.

## SUBSTANTIVE ALLEGATIONS

**Background**

33.    STEC designs and sells custom memory solutions based on solid state technologies, including SSDs, flash memory and DRAM technologies. Throughout the 2000s, STEC grew rapidly, expanding its manufacturing facilities, acquiring a Flash controller design team from Cirrus Logic, establishing an OEM Sales Division, acquiring Kelly Microsystems and Silicon Tech, and opening European offices. In 1995, the Company was recognized on the Inc. 500 list as one of the 50 fastest-growing businesses in the United States. However, by 2009, the Company's sales, earnings and prospects for future growth had begun to soften. This, in turn, created a massive dilemma for STEC insiders, including defendants, Manouch and Mark Moshayedi who owned millions of shares of STEC common stock and were trapped in increasingly potential illiquid investments.

34.    To overcome this disparate situation, beginning in mid-2009, defendants embarked on a public relations campaign designed to prop up the trading price of STEC common stock, and, in turn, the Company's shareholders' equity by making false and misleading statements regarding the level of competition faced by STEC in the SSD technology market and STEC's purported dominance of that market.

35.    For example, defendants misrepresented STEC as the only manufacturer of enterprise-scale SSDs, with promises of extraordinary revenue growth. Defendants also repeatedly announced increasingly higher earnings per share ("EPS") and revenue

8

524368_1

guidance as a result of its purported monopoly of the SSD market and, in particular, its flagship product, ZeusIOPS.

**False and Misleading Statements Regarding STEC's Heavy Reliance on EMC**

36. Throughout its history, STEC heavily aligned itself with one large customer to purchase its SSDs. From January 2006 to December 2008, Cisco was STEC's primary customer. Cisco ceased being STEC's primary customer and that title went to EMC. Thereafter, EMC became STEC's primary customer and remained so until late 2009/early 2010.

37. Once EMC became STEC's key customer, STEC relied heavily on EMC to generate business through its acceptance of STEC's products. Towards this end, STEC executives, including defendants Manouch and Mark Moshayedi, personally directed all material aspects of STEC's relationship with EMC. This included, among other things, directing STEC's marketing efforts toward EMC and EMC's purchases and sales of STEC products.

38. To enhance the efficiency of the STEC-EMC relationship, defendants even stationed STEC engineers at EMC. By having STEC personnel on-site at EMC, defendants were able to obtain what one analyst described as "good insight" into the levels of and sales of STEC products through EMC's business. As a result, when asked about visibility into EMC's purchases and sales of STEC products in 2009, defendant Manouch Moshayedi emphatically stated that STEC's customers, including EMC, provided STEC with "very solid forecasts."

39. The unusual closeness – indeed, seamlessness – of the STEC-EMC relationship has not escaped the notice of federal authorities. Even before the truth about STEC's sales and demand began to be revealed, STEC's relationship with EMC caught the attention of the SEC. Following the unusually fast rise of STEC's stock price after announcements about deals with EMC, and the massive insider selling by

9

524368_1

the Moshayedi Defendants described herein, the SEC questioned whether STEC had been forthcoming with investors, in particular with respect to its dependence on EMC.

40.     Thus, on August 28, 2009, the SEC inquired why, despite the fact that the Company depends on EMC for a significant portion of its revenue, the Company had not disclosed any agreements with EMC.  Shortly thereafter, the STEC Board was informed of the SEC inquiry.  On September 10, 2009, defendants caused STEC to respond to the SEC's letter by stating that the EMC agreements were not ones upon which the Company was substantially dependent.  The SEC then followed up by letter dated September 30, 2009, inquiring why the Company believed it was not substantially dependent upon its agreements with EMC and another top customer. The SEC also requested that STEC advise, in quantitative terms, whether sales to these customers were based on a few large purchase orders or upon multiple small ones.  STEC responded by letter dated October 13, 2009, and continued to maintain that the Company was not substantially dependent upon its agreements with EMC.

**The Scheme to Artificially Inflate STEC Shares**

41.     Throughout the brief Relevant Time Period, defendants knowingly engaged in various fraudulent practices to dramatically increase STEC's stock price and create a window for the Company's two most senior executives to sell more than 9 million shares of stock, approximately 50% of their holdings, for proceeds *in excess of $267 million*.  These fraudulent practices centered on defendants' manipulation of the Company's revenue and revenue guidance to investors and the market – key metrics that determined STEC's financial health.

42.     After falsely fueling an extraordinary rise in the price of STEC stock from $4 per share in December 2008 to $35.50 per share on August 3, 2009 as alleged herein – an increase of over 850%, defendants announced that they would conduct a "Secondary Offering" of at least 7.5 million shares, all for the personal profit of defendants Manouch and Mark Moshayedi, with no proceeds going to the Company. STEC filed a Registration Statement with the SEC for the offering of the Moshayedi

10

524368_1

Defendants' personally held shares of STEC. The Registration Statement was signed by defendants Manouch Moshayedi, Mark Moshayedi, and Cook, and certain directors.

43.     Just three days after announcing the secondary offering, on August 6, 2009, STEC announced the price of the offering, $31 per share, and that the amount of shares offered in the secondary offering would be raised to 9 million shares.

44.     The Company filed a Prospectus for the offering with the SEC on August 7, 2009, which was incorporated into the Registration Statement filed on August 3, 2009. The Prospectus also incorporated by reference the 2Q09 Form 10-Q, in addition to other SEC filings. The Prospectus included the following representations that it would be difficult for competitors to catch up with STEC:

> We believe that we are a technology leader in solid-state storage due to our nearly 20 years of focus on advanced memory solutions. Throughout our history, we have delivered advanced memory and storage solutions to a wide range of customers in various market segments, and we continue to develop products to meet the need of enterprises to constantly improve the retention of, and access to, critical data at high performance levels.

45.     These statements were materially false and misleading when made. In truth, as noted herein, defendants knew and/or deliberately disregarded that competition would likely enter the market within the next six months.

46.     On May 29, 2009, defendants Manouch and Mark Moshayedi adopted Rule 10b5-1 trading plans. The 10b5-1 trading plan program enables insiders to set predetermined contractual sales of stock in advance regardless of the knowledge of material information. Here, because the insiders (defendants Manouch and Mark Moshayedi) urgently wanted to take advantage of the newly inflated stock price before the truth was revealed, they promptly cancelled their new 10b5-1 plans, *only two*

524368_1

11

1   *months after they were created*, and quickly unloaded 9 million shares of their stock

2   (4.5 million shares each) in the secondary offering.

3      47.     Defendants Manouch and Mark Moshayedi completed their sale at $31

4   per share – nearly *double* STEC's stock price just two months earlier at the beginning

5   of the Relevant Time Period.

6      48.     Manouch and Mark Moshayedi had never previously sold such massive

7   amounts of their STEC stock. In fact, the shares sold by the Moshayedi Defendants

8   were, collectively, more than 11 times the number of shares they sold in the six

9   months before the Relevant Time Period and 20 times the number of shares they sold

10   in all of 2008. That was the largest insider selling in the history of the Company.

11      49.     In the prior calendar year, 2008, defendant Manouch Moshayedi did not

12   sell *any* stock, and sold only 400,000 shares in March 2009 for proceeds of $3 million.

13   Defendant Mark Moshayedi sold only 466,292 shares in June 2008 and another

14   400,000 shares in March 2009, for proceeds of $6.5 million and $3 million,

15   respectively. Thus, the Moshayedi Defendants' trading was highly suspicious in

16   volume and timing.

17      50.     These sales dramatically reduced the Moshayedi Defendants' insider

18   holdings in STEC. On that day, the Moshayedi Defendants went from collectively

19   owning 35.5% of the Company's stock, down to owning just 17.4%. Defendant

20   Manouch Moshayedi reduced his STEC holdings from 14.8% of the Company to

21   6.5% and defendant Mark Moshayedi reduced his STEC holdings from 20.7% to

22   10.9%.

23      51.     The Moshayedi Defendants were remarkably successful in timing their

24   offering, selling at a near all-time high of $31 per share. There are only two months in

25   the Company's entire history in which its stock price traded higher, just before the

26   truth began to be revealed.

27      52.     This incident of successful timing, however, was not the first time that

28   the Moshayedi Defendants were, as one commentator characterized it, "spot-on" for

524368_1

1   the timing of an extraordinary offering of their own personal shares. For example, on

2   October 1, 2003, STEC (then-called SimpleTech, with Manouch Moshayedi serving

3   as the CEO, Mark Moshayedi serving as the COO and Chief Technology Officer

4   ("CTO"), and their brother, Masoud Moshayedi, serving as the President) announced

5   the Company's third quarter 2003 guidance as a result of a purported increased

6   demand for the Company's products. The Company raised revenue guidance of $57

7   to $58, from the earlier guidance of $48 to $50, and raised the EPS to $0.01 from its

8   previous guidance of $-0.01.

9       53.    The very same day, the Company announced a secondary offering of 10

10  million shares, including 2.5 million shares personally held by the three Moshayedi

11  brothers and other insiders. The Company disclosed that the proposed offering would

12  allow the three Moshayedi brothers to go from 78.6% ownership to 51.5% ownership.

13  When they made the announcement, STEC shares were near their then all-time high.

14  As with defendants Manouch and Mark Moshayedi's most recent offering of their

15  own personal STEC shares, within just months after the Moshayedi Defendants

16  cashed in their shares of STEC at inflated prices, the stock price plummeted back to

17  what its price had been before the Moshayedis' increased guidance. Not surprisingly,

18  the stock price chart for that 2003 time-period looks nearly identical to the stock price

19  chart related to the Moshayedis' most recent sell-off.

20  **Defendants' False and Misleading Statements Regarding
    Company Competition and Performance**

21

22      54.    Defendants' extraordinary efforts to artificially inflate STEC's stock

23  price in order to benefit themselves began on June 16, 2009 (the beginning of the

24  Relevant Time Period) when STEC issued a press release announcing increased

25  earnings and revenue guidance for the second quarter 2009. As detailed further

26  below, the press release explained that the increased earnings and revenue were

27  *"primarily the result of increases in the Company's ZeusIOPS sales which now are*

28  *estimated to exceed $55 million during the second quarter of 2009."*

13

524368_1

55. The press release entitled "STEC Increases Its Guidance for the Second Quarter of 2009," stated in part:

STEC, Inc. today announced that based on the Company's preliminary review of its anticipated financial performance, it is increasing its guidance for the second quarter of 2009.

The Company expects to report Non-GAAP [Generally Accepted Accounting Principles] diluted earnings per share in the range of $0.32 to $0.36, versus the previous guidance of $0.20 to $0.22 per diluted share announced on May 11, 2009.

The Company also expects to report revenue in the range of $82 million to $84 million, versus the previous estimate of $68 million to $70 million.

The increased Non-GAAP diluted earnings per share and revenue guidance are primarily the result of increases in the Company's ZeusIOPS sales which now are estimated to exceed $55 million during the second quarter of 2009.

The Company had previously estimated revenue from ZeusIOPS SSDs to surpass $65 million during the first half of 2009. With this increase in revenue, the Company now expects ZeusIOPS SSD sales to exceed $80 million during the first half of 2009.

56. On July 16, 2009, defendants caused STEC to issue a press release entitled "STEC Signs a $120 Million Supply Agreement for ZeusIOPS SSDs for 2H 2009 and Now Forecasts Sales of ZeusIOPS SSDs to Exceed $220 Million in 2009 – STEC and Its Major Enterprise Storage Customers Continue Collaboration to Drive Adoption of SSD Technology Into High-Performance Enterprise Storage Systems," which stated in part:

STEC, Inc. announced today that it has signed an agreement with one of its largest enterprise storage customers for sales of $120 million of

14

524368_1

1    ZeusIOPS SSDs in the second half of 2009.  STEC believes that this
2    agreement reflects the enterprise storage manufacturer's continued
3    commitment to integrate STEC's SSD technology into the
4    manufacturer's systems and validates significant storage system
5    performance improvements enabled by STEC's ZeusIOPS SSDs in these
6    enterprise systems.  With this agreement signed, STEC now forecasts
7    revenue from the sale of its ZeusIOPS drives will exceed $220 million in
8    2009.

9         "We are pleased to see that sales of our customer's enterprise
10   storage systems utilizing our ZeusIOPS drives have grown significantly
11   over the past few years," said Manouch Moshayedi, Chairman and Chief
12   Executive Officer of STEC.  "Our customers have helped evangelize this
13   technology and we are glad to be partnered with them as we expect that
14   they will help drive further innovation in SSD usage in the highest-end
15   of the enterprise storage markets."

16        The STEC ZeusIOPS SSD product family offers a comprehensive
17   array of options for enterprise system architects.  ZeusIOPS SSD
18   provides a wide range of interface options, spanning Fibre Channel to
19   SAS to SATA, as well as the widest range of capacity options, spanning
20   73GB to 1TB.  Fundamental to the ZeusIOPS product family is the
21   proprietary SSD architecture which renders an enterprise-optimized
22   storage device with an unprecedented combination of performance and
23   energy efficiency.

24   57.    The above statements regarding STEC's $120 million supply agreement
25   for ZeusIOPS failed to disclose and misrepresented the following material adverse
26   facts, which defendants knew, consciously disregarded, were reckless and grossly
27   negligent in not knowing or should have known:

28

524368_1

15

1            (a)    Such significant shipments would over-supply EMC – STEC's

2    largest customer accounting for more than 90% of its ZeusIOPS Sales – with several

3    quarters' worth of excess inventory; and

4            (b)    This increased revenue could not continue because EMC intended

5    this $120 million order to cover its inventory needs until the middle of 2010, such that

6    STEC's revenue would decline dramatically if it did not find additional large

7    customers for the first half of 2010. As EMC stated in its January 26, 2010 earnings

8    conference call, its $120 million build up of inventory in the fourth quarter "was

9    designed to protect" EMC going into 2010 against a "tight supply environment." A

10   February 23, 2010 Thomas Weisel Partners' report also noted that "EMC has

11   repeatedly indicated that the SSD inventory build-up reflected a management choice

12   to protect EMC against potential tightness of supply in 1Q10."

13       58.    On August 3, 2009, defendants caused STEC to announce its second

14   quarter 2009 financial results, in a release that stated in part:

15          STEC, Inc. announced today its financial results for the second quarter

16          ended June 30, 2009. Revenue for the second quarter of 2009 was $86.4

17          million, an increase of 53.7% from $56.2 million for the second quarter

18          of 2008, and an increase of 35.9% from $63.5 million for the first quarter

19          of 2009. Shipments of our ZeusIOPS Solid-State drives ("SSD") into the

20          Enterprise-Storage market grew to $57.7 million for the second quarter

21          of 2009, an increase of approximately 375% from $12.1 million for the

22          second quarter of 2008, and an increase of approximately 125% from

23          $25.7 million for the first quarter of 2009.

24          GAAP gross profit margin was 50.0% for the second quarter of

25          2009, compared to 32.3% for the second quarter of 2008 and 36.3% for

26          the first quarter of 2009. GAAP diluted earnings per share from

27          continuing operations was $0.38 for the second quarter of 2009,

28

524368_1

1    compared to $0.03 for the second quarter of 2008, and $0.07 for the first

2    quarter of 2009.

3                *      *      *

4       Additional highlights for the second quarter of 2009 include:

5    *    signed a recently-announced $120 million contract to supply

6         ZeusIOPS SSDs to a major Enterprise-Storage customer for the

7         second half of 2009;

8    *    signed a $28 million, 12-month contract to supply the ruggedized

9         MACH8 SSD to a leading defense systems contractor, extending

10        reach of one our key product lines beyond the traditional storage

11        market;

12   *    accelerated adoption of the ZeusIOPS SSDs into major Enterprise-

13        Storage and Enterprise-Server OEM customers, including IBM,

14        Fujitsu, Compellent and HP;

15   *    increased cash and cash equivalents, and short-term investments at

16        the end of the second quarter of 2009 to approximately $94

17        million, a 49% increase from the end of the prior quarter;

18   *    decreased inventory to approximately $38 million at the end of the

19        second quarter of 2009, a 16% decrease from the end of the prior

20        quarter; and

21   *    successfully transitioned 100% of the Company's manufacturing

22        from California to Malaysia.

23   Business Outlook

24       "It is exciting to share such outstanding results today and to

25   deliver significant revenue, gross profit margin and EPS growth for the

26   second quarter of 2009," said Manouch Moshayedi, STEC's Chairman

27   and Chief Executive Officer.   "We have shown a significant

28   improvement in our already strong balance sheet – particularly in the

524368_1

generation of cash and effective management of inventory – added four more major Enterprise-Storage OEMs to our blue chip customer list, and surpassed our stated year-end 2009 non-GAAP gross profit margin goal of 40%, expanding it to 50% in the second quarter of 2009.

"In our prior quarter's earnings announcement we had estimated that ZeusIOPS revenue for the first half of 2009 would surpass $53 million. I am pleased to report that we have actually achieved $83 million in ZeusIOPS revenue for this period. Although we are still early in the process of the adoption of SSDs into the Enterprise-Storage market, I believe that the $120 million supply agreement that we signed for the second half of 2009 is a further indication of future SSD growth and customers' acceptance of SSDs into this growing market. I am very excited about our product road map – specific to the Enterprise-Storage, Enterprise-Server and related markets."

59.   Also on August 3, 2009, defendants filed STEC's quarterly report with the SEC on Form 10-Q for the second quarter 2009 ("2Q09 Form 10-Q"). Defendants Manouch Moshayedi and Cook signed the Company's 2Q09 Form 10-Q, affirming the financial results and stating, in part:

We expect continued growth in the sales of our Flash-based SSD ZeusIOPS products through 2009 based on the accelerated adoption of our ZeusIOPS SSDs by most of our major enterprise-storage and enterprise-server OEM customers into their systems. As part of this expected growth, on July 16, 2009 we announced an agreement with one of our largest enterprise storage customers for sales of $120 million of Zeus lOPS SSDs in the second half of 2009.

60.   Defendants' statements in the August 3, 2009 press release and STEC's 2Q09 Form 10-Q failed to disclose that the EMC deal was a "one-off" (i.e., one time) deal that would supply EMC for several months, was not an "indication of future SSD

18

growth," and, in accordance with GAAP, the EMC deal could not be recognized in full during 2009.

61.    Additionally, on August 3, 2009, defendants caused STEC to announce a secondary offering of an aggregate of 7.5 million shares of common stock by selling shareholders and officers of STEC, defendants Manouch Moshayedi and Mark Moshayedi, giving underwriters an option to purchase 1.125 million additional shares from the selling shareholders, solely to cover any over allotments. The proceeds from the sales by the selling shareholders stated that STEC would not receive any of the proceeds from the sales in this offering. On that day, STEC filed a Registration Statement signed by defendants Manouch Moshayedi, Mark Moshayedi, Ball, Bahri, Colpitts, Witte, Moses and Cook. The Registration Statement was incorporated by reference in the subsequently filed Prospectus.

62.    After releasing its second quarter 2009 financial results on August 3, 2009, STEC hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

> [COOK:] We are very pleased to report our second quarter of 2009 net revenues of $86.4 million surpassing [our] revised guidance of $82 million to $84 million, and up 36% over the first quarter of 2009. Revenue from our signature ZeusIOPS SSDs was $57.7 million and up nearly 125% over the first quarter of 2009 revenue of $25.7 million.
>
> *        *        *
>
> Turning now to our guidance for the third quarter of calendar year 2009, we expect our revenues to be in the range of $95 million to $97 million with diluted non-GAAP earnings per share in the range of $0.45 to $0.47.
>
> *        *        *
>
> [MANOUCH MOSHAYEDI:] We think that . . . , on a go forward basis, our margins will remain in the 50 to 60% area. As you know, *we have*

19

524368_1

1   *no competition at this stage*.  In addition to that, the current hard drive
2   manufacturers in the enterprise area are still making upwards of 40%
3   margin in that business.  So we feel that even going forward, if we have
4   competition in the area of enterprise, with moving to Malaysia, with
5   combination of changing our FGPAs to ASIC next year, and also the
6   capacity that we've built in Malaysia and being able to build all of these
7   – streamline all of the buildings of the SSDs, I think we will be able to
8   maintain about 50% margin for ZeusIOPS.  And as ZeusIOPS grows to
9   be the biggest part of our sales, I think we'll maintain the same type
10   margins.

                                          *      *      *

12   [ANALYST:] And just along those lines, if you look at your biggest
13   customer, 39%, in the 10-Q filing for Q2, and that's coming from 20%
14   Q1, if you assume the biggest customer is driving basically all the
15   ZeusIOPS, in terms of ZeusIOPS revenue that would be roughly 49% of
16   ZeusIOPS revenue in Q1 and 58% in Q2.  What happens to this
17   percentage associated with this biggest customer in terms of ZeusIOPS
18   as you go into the second half.  I got to assume with more customers and
19   newer customers that you gain in the first half starting to hit volume
20   production in the second half that really this percentage for this biggest
21   customer as a percentage of the total ZeusIOPS business [h]as to start
22   coming back down a little bit.  Would that be right?

23       [MANOUCH MOSHAYEDI:] Exactly, Gary.  Just to be clear, I
24   think on the ZeusIOPS side, the other four customers that we have in this
25   area, they have to come up and do the marketing and sales that the first
26   customer is doing to get up to those sort of volumes.  But going forward,
27   I can't predict exactly if it is going to be next quarter or the quarter after,
28   everybody is working extremely hard in getting SSDs, on top of their

524368_1

1    enterprise storage devices, they're trying to devise new systems, SSD

2    based only, so I think this is a very good indication of what could happen

3    to our revenues and profits going forward once the other four customers

4    start hitting their marks also.

5                               *       *       *

6    [ANALYST:] Quick question on EMC, your largest customer.  They

7    made a comment about, on their earnings call about shipping close to a

8    petabyte [or] actually over a petabyte of Flash related storage year to

9    date.  And that conference call took place three weeks into the month of

10   July.  Obviously there's been a fairly steep ramp, particularly in light of,

11   if we're guessing correctly, to that large supply contract you signed for

12   second half of the year involved, but how much of – if we're thinking

13   about that petabyte shift, was July a fairly big month for you guys in

14   terms of shipments so far?  Just want to get my hands around the

15   steepness of the ramp going into the second half of the year.

16        [MANOUCH MOSHAYEDI:] We think that ZeusIOPS sales from

17   Q to Q is going to go up about $10 million from Q2 to Q3.  So the ramp

18   is right now about 20% rate on a quarterly basis.  That's basically based

19   on one customer in production, four customers are still in pre production

20   type of stage.  So I think we will start seeing a ramp on a few things.

21   One of our customers is in the middle of discussions in terms of M&A

22   discussions.  I think once that gets resolved, the customer will kick back

23   in and start buying at its original rate.  The other three customers are

24   very large, and it takes them a little longer to get all the parts right.  So I

25   think once they start kicking in, we will see huge ramps in sales of

26   ZeusIOPS going forward.  I don't know if it's going to be next quarter,

27   the quarter after, but it will come sooner or later.

28                               *       *       *

21

524368_1

[ANALYST:] If I'm looking at the time math right, with the 39% of revenue that you got from your largest customer, be it maybe EMC, we'll assume, and what you're guiding, I guess still reiterating the 220 in terms of Zeus revenue for the full year, it seems to me that you're – are you being relatively pretty conservative with regard to the ramp to the other customer opportunities, which I think last quarter you said would reach into full production in Q3?

[MANOUCH MOSHAYEDI:] Yes, so I think other customers are taking a little bit longer than expected in terms of full production. They're introducing the systems into the market. It looks like everybody is going through the same trials and tribulations that our first customer went through in terms of sales and marketing side. So, it's still a, I would say, maybe a quarter or two away from full ramping production.

63.   In truth, defendants knew, or deliberately disregarded, that the EMC deal was a deal that would only supply EMC for several months, and was not an "indication of future SSD growth," and, in accordance with GAAP, the EMC deal could not be recognized in full during 2009.

64.   Moreover, EMC accounted for 90% of STEC's sales of Zeus and approximately half of STEC's overall revenue. However, by the time STEC sent the October letter to the SEC, still undisclosed to investors, the Company had already accrued $1.5 million in expenses for a joint marketing project designed to assist EMC in selling its excessive inventory of STEC products. At the time these statements were made, defendants knew, or deliberately disregarded, that EMC would have an inventory carryover in 2010 that would reduce STEC's sales and would force STEC's revenues to suffer significantly for at least the first quarter of 2010. In fact, STEC eventually announced that its 1Q10 revenue would be as much as 53% lower than Wall Street's expectations as a result of oversupplying inventory to EMC.

65.   The Company filed a prospectus for the offering on August 7, 2009, which was incorporated into the Registration Statement filed on August 3, 2009. The Prospectus included the following representations that it would be difficult for competitors to catch up with STEC:

> We believe that we are a technology leader in solid-state storage due to our nearly 20 years of focus on advanced memory solutions. Throughout our history, we have delivered advanced memory and storage solutions to a wide range of customers in various market segments, and we continue to develop products to meet the need of enterprises to constantly improve the retention of, and access to, critical data at high performance levels.

> **Our solutions**

> The key features of our products include:

> *   *Proprietary controller IC technology.*  In order to be first-to-market with innovative storage technologies, we design the fundamental logic for our SSD products.  The controllers within our various SSD products are the key to enabling high levels of performance and reliability.

> *   *High degree of customization.*  Products sold to our customers are typically customized by our design and engineering teams to meet our customers' specific design requirements.

> *   *High performance.*   Our SSD technology is optimized for exceptionally low-latency, fast access times and sustained high megabyte-per-second speeds.

> *   *High density.*  Our patented Stacking technology allows us to design and manufacture products in which multiple memory chips are stacked vertically to increase the capacities without increasing the product footprint.  In some cases, our IC Tower and Postage

23

Stamp stacking memory technology allows us to create a high capacity solution that is otherwise not currently available in the market using standard devices, and in other cases it allows us to provide the same capacity as a standard module at a lower price point.

*   *Compact size.*  We are able to manufacture high-density products with some of the smallest form factors in the market in order to meet the ever-reducing size requirements of our customers' products.

*   *High reliability.*  Our products are built utilizing sophisticated error detection and correction processes to provide high data reliability and integrity.  In addition, our products are designed to withstand high levels of shock and vibration as well as extreme temperature fluctuations.

*   *Low power consumption.*  SSD products generally require less power than equivalent IOPs performance HDDs because fewer SSDs are required to achieve the same performance and SSDs do not contain moving parts.

66.   In truth, defendants knew, and/or deliberately disregarded, or were grossly negligent in not knowing, or should have known, that competition would likely enter the market within the next six months.  For example, defendants knew, and/or deliberately disregarded, that STEC's competitor, Pliant Technology, had begun sampling an enterprise SSD with customers and expected an initial qualification in the fourth quarter.  They also knew, and/or deliberately disregarded, that other competitors, such as Hitachi, were on track to qualify its SSD in early 2010.  Defendants knew this and other information showing actual competition at least as early as July 2, 2009, when an industry-specific website, Enterprise Storage Forum, published an article entitled "Solid State Drive Developers Try To Catch STEC."

24

524368_1

1    Additionally, during August and September 2009, key STEC customers had been
2    working closely with Toshiba on qualification of a Toshiba SSD, which would have a
3    significant adverse effect on STEC's future results.   This development was not
4    disclosed to STEC investors.

5        67.    On September 10, 2009, STEC issued a letter responding to an
6    August 28, 2009 comment letter from the SEC that inquired, in part, regarding
7    whether STEC was "substantially dependent" on EMC.  In that letter, which was
8    publicly filed with the SEC, STEC stated, in part:

9           [I]n the unlikely event a customer should default under a purchase order
10          or other sales agreement, STEC generally believes it could find a
11          replacement customer for the relevant product. STEC additionally could
12          enter into a sales agreement with a new customer which would, in turn,
13          reduce the corresponding percentage of revenues attributable to ongoing
14          customers during a specific period.

15          STEC recognizes the loss of a customer or a significant reduction
16          in purchases by a customer could impact revenues.  STEC does not
17          believe, however, that its business would be fundamentally altered
18          without a specific customer sales agreement to suggest the Company's
19          business is substantially dependent upon that agreement.

20   STEC reiterated this contention in a second letter to the SEC, dated October 13, 2009.
21   In that publicly filed letter, STEC stated again that: "STEC does not believe that it was
22   substantially dependent upon the underlying agreements in place with these customers
23   . . . ."

24       68.    In truth, EMC accounted for 90% of STEC's sales of Zeus and
25   approximately half of STEC's overall revenue. However, by the time STEC sent this
26   October letter to the SEC, still undisclosed to investors, the Company had already
27   accrued $1.5 million in expenses for a joint marketing project designed to assist EMC
28   in selling its excessive inventory of STEC products.  At the time these statements

524368_1

were made, defendants knew, or deliberately disregarded, that EMC would have an inventory carryover in 2010 that would reduce STEC's sales and would force STEC's revenues to suffer significantly for at least the first quarter of 2010. In fact, STEC eventually announced that its 1Q10 revenue would be as much as 53% lower than Wall Street's expectations as a result of oversupplying inventory to EMC.

## THE TRUTH IS REVEALED

69.     On September 17, 2009, WedBush Morgan published its analyst report on STEC, identifying important adverse information it had obtained, not from the Company, but through its own independent research, stating in part:

- *Our industry checks indicate that one of STEC's Tier I OEM enterprise customers is in final qualification stages with Toshiba for its Single Level Cell (SLC) NAND-based serial attached SCSI (SAS) interface SSD.* While we had expected STEC's competitors to gain design wins at its OEMs, we believed this would likely not occur until [the first half of 2010].

- *Industry checks lead us to believe a leading Hard Disk Drive (HDD) OEM is likely set to introduce a SLC SATA/SAS SSD and possibly a Multi-Level-Cell (MLC) SSD drive in Q4.* . . .

70.     Thus, it was revealed for the first time that, contrary to defendants' statements (including just a month earlier during the August 3, 2009 earnings conference call) that there is "no competition" for STEC's enterprise-scale products and "the probability of someone coming out with a . . . ZeusIOPS-like SSD" is "*zero*," at least one competitor, Toshiba, was in the process of qualifying a competitive SSD product with one of STEC's top tier customers. Wedbush Morgan thus cut its 12-month price target from $45 to $39.

71.     Not only did this report disclose that new competitors were entering the market with products that would threaten STEC's business, but it also revealed that one such competitor, Toshiba, was in the final qualification stage with one of STEC's

524368_1

1   own customers. Thus, the market learned that the undisclosed risk, that STEC's bad

2   business practices could result in its own customers seeking other vendors for product

3   development, was beginning to materialize.

4        72.    This news of increased competition and a defecting Tier I customer came

5   in the shadow of the August announcement that the defendants Manouch and Mark

6   Moshayedi would be dumping $267.8 million of their personally held stock following

7   the $120 million deal with EMC and amidst SEC inquiries regarding, *inter alia*,

8   STEC's dependence on two key customers, one of them being EMC.

9        73.    Indeed, defendant Manouch Moshayedi later admitted in a September 21,

10   2009 interview (after the Moshayedis had unloaded their stock), STEC "never

11   expected to be a single source in this market forever," and defendants knew that "[i]t's

12   perfectly inevitable that people will have second or third qualified vendors in this

13   market."

14        74.    As a result of this report, STEC's stock collapsed $6.37 per share to close

15   at $31.53 per share on September 17, 2009, wiping out over $300 million in

16   shareholder equity.

17        75.    After the market closed on November 3, 2009, STEC disclosed for the

18   first time that the $120 million EMC deal that defendants announced just four months

19   earlier had supplied EMC with excess inventory into first quarter 2010. Defendants

20   also disclosed that the EMC deal was only a one-time deal, and, contrary to

21   defendants' prior representations, was not indicative of strong demand and future

22   revenue growth for STEC SSDs. STEC's press release quoted defendant Manouch

23   Moshayedi, in part:

24        "One of our customers entered into a $120 million supply agreement

25        with us for   shipments covering the second half of 2009. We recently

26        received preliminary indications that our customer might carry inventory

27        of our ZeusIOPS at the end of 2009 which they will use in 1Q 2010."

28

524368_1

76. STEC tried to reassure investors, however, that the issue was being remedied, as follows:

In light of this development, we have jointly initiated a strategic sales and marketing incentive program designed to promote the integration of STEC's SSDs into their systems. As of September 30, 2009, we have accrued $1.5 million of estimated costs for this marketing incentive program. Both companies believe that we will be successful in increasing the pace of the replacement of HDDs with SSDs.

77. Also in the November 3, 2009 press release, the Company stated:

Business Outlook

"I am very pleased to share with you, our exceptional results for the third quarter of 2009," said Manouch Moshayedi, STEC's Chairman and Chief Executive Officer. *"Our solid operating results, the strengthening of our balance sheet and the further integration of our SSDs into our customers' platforms leave us in a great position to address the growth opportunities and challenges that lie ahead. Despite a sluggish economy, we believe our growth through the end of the year will continue."*

\*      \*      \*

"We are also working on implementing sales and marketing incentive programs at our other major customers to further proliferate the use of our SSDs in their systems. *We believe that it is just a matter of time before these customers become more significant to our overall sales of SSDs. In addition, we continue to qualify our ZeusIOPS into new platforms at our customers and are working closely with them to promote integration of SSDs into their systems by participating in sales conferences and end-user training programs both in the U.S. and in*

28

524368_1

*Europe.* We believe these activities will help accelerate the adoption of our SSDs over the course of 2010.

Longer-term, we believe that SSDs in the Enterprise market are here to stay and will grow to become a very significant market within the next five years. ***Further, we believe that as this market grows, there will be room for a few additional players and that STEC will remain the dominate player in Enterprise-class SSDs.***

Guidance

We currently expect fourth quarter of 2009 revenue to range from $101 million to $103 million (net of $2.4 million of estimated reserves related to sales and marketing incentive programs) with diluted non-GAAP earnings per share to range from $0.51 to $0.53."

78.   The foregoing statements regarding STEC's relationship with EMC were materially false and misleading and tempered the impact of the disclosure that EMC, in fact, had excess inventory.  At that time, defendants knew, or deliberately disregarded, but failed to disclose to investors and the market, that EMC was unlikely to commit to another deal with STEC because STEC had oversupplied EMC with faulty products that were riddled with errors and that new competitors were entering the market, creating price competition and allowing EMC to demand higher quality.

79.   That same day, November 3, 2009, defendants hosted an analyst conference call. On that call, defendant Manouch Moshayedi represented that "EMC still remains our top customer.  And I would say that most of our ZeusIOPS is done through EMC. The rest of the customers are pretty small, so in terms of the ZeusIOPS sales, 90% EMC, 10% the rest of the customers, I would say."

80.   In the November 3, 2009 analyst conference call, Manouch Moshayedi reassured investors that the new "*extensive product marketing program*" entered into with EMC "*will push through any sort of inventory issues and it will, in the future quarters, will pick up any sort of sales that they might have in this product line.*"

Manouch Moshayedi continued:

So, this program, by the way . . . it's extremely significant for us. If it does become successful, we could tremendously move our revenues up because what it does, in a sense, it educates every single salesperson at our customer about SSDs. And incentivize them to go sell SSDs.

\*      \*      \*

So I think on a go-forward basis, even at this cost of the marketing program for us, it's – if it's really successful, it could really change our revenue model as a whole for 2010 and beyond.

He detailed that the program would include, for example, "incentives" for sales personnel to push Zeus to customers and offering rebates to customers.

81.     The foregoing statements failed to disclose that STEC was not in a "great position" to address purported "growth opportunities" nor was STEC's joint marketing program likely to "tremendously move [STEC's] revenues up." In truth, as detailed herein, STEC's customers would not rush in to take EMC's place once its inventory overhang was eliminated.

82.     During the November 3, 2009 analyst conference call, defendant Manouch Moshayedi was asked by an analyst: "With the supply agreement, I guess even when the inventory eventually runs out, do you expect to have the supply agreement renewed?" Manouch Moshayedi responded:

It is possible. It depends on where we are at that point in terms of the whole supply that's out there.

I don't think that we need at this point to sign another supply agreement with a customer who is buying exclusively from us and doing everything that they can to promote our SSDs.

So when we did sign the last of our agreement, we did – *this was a one-off type of a deal*. It was a very big deal for us and we had to go buy the products. Once we bought the products and we've got chips

30

coming into us, and since the rest of the customers haven't picked up yet,
I don't think we're going to be asking our customer for another
commitment on – I don't think we are going to need a commitment.

83. This was the first time STEC had acknowledged that, contrary to defendants' prior statements that the $120 million EMC deal was for third and fourth quarter 2009, it had supplied EMC with inventory into first quarter 2010. Likewise, it was the first time that STEC had acknowledged that, contrary to STEC's prior statements that the $120 million EMC deal was indicative of future revenue from STEC's SSDs (and analysts' echoing of defendants' statements, such as the October 28, 2009 statement by Rothman Research just days earlier that the agreement "is a further indication of future SSD growth and customers' acceptance of SSDs into this growing market"), the EMC deal was *not* indicative of future SSD growth, but rather was a "*one-off type of deal*," *i.e.*, a one-time deal, with no commitment for future deals.

84. CEO Manouch Moshayedi also indicated during the related November 3, 2009 analyst conference call that sales of the Zeus line in the latest quarter were $60.7 million, below previous guidance of $67 million to $68 million. He also indicated that sales of Zeus to IBM had also been disappointing because "IBM has not found a way of going and implementing SSDs into the market yet," and that demand from Sun Microsystems also is "a little bit slow for us."

85. Several analysts took note of the Company's "changed" visibility. For example, during the conference call, analyst Jeff Schreiner questioned the accuracy of Manouch Moshayedi's prior statements that there was no real competitive threat. Mr. Schreiner also noted that: "Your visibility seems to have changed. I don't want to, I guess, use any adjectives. Let's just say it's changed, but when do you believe the prior visibility returns[?]"

86. Another analyst, Kevin Vassily, questioned why defendants Manouch and Mark Moshayedi had sold a majority of their position in STEC stock at just the

31

1   right time. Mr. Vassily also questioned whether defendants had any knowledge then

2   that EMC was not pushing through as much inventory as STEC might have thought.

3   Rather than respond to the analyst's question of whether *he* had any knowledge

4   regarding EMC's build-up of inventory at the time of his insider sales, defendant

5   Manouch Moshayedi responded only that, at the time the Moshayedis sold their stock,

6   EMC had just placed that purchase order, "so I don't think at that time that they knew

7   that three months down the road, their sales flow wasn't going to be as good as they

8   had thought." He further explained – while avoiding a response to the question of

9   whether he had any knowledge of the excess inventory – that "[t]he reason why they

10  put that sale, that PO, in place was to make sure that they have secured amount [sic] of

11  flash and we can build enough for the demand."

12      87.   In response to a direct question of whether the "excess inventory" would

13  impact only STEC's first quarter, or both its first and second quarter revenue numbers,

14  Manouch Moshayedi reassured investors that the issue would not "be that huge," and

15  that the excess inventory issue ***would not impact STEC's second quarter revenue***

16  ***numbers***.

17      88.   In further reassuring investors of prospects for acceptance by customers

18  and resulting revenue from STEC's SSDs, Manouch Moshayedi explained as follows:

19      "We are also working on implementing sales and marketing

20      incentive programs at our other major customers to further proliferate the

21      use of our SSDs in their systems. We believe that it is just a matter of

22      time before these customers become more significant to our overall sales

23      of SSDs. In addition, we continue to qualify our ZeusIOPS into new

24      platforms at our customers and are working closely with them to

25      promote integration of SSDs into their systems by participating in sales

26      conferences and end-user training programs both in the U.S. and in

27      Europe. We believe these activities will help accelerate the adoption of

28      our SSDs over the course of 2010.

32

524368_1

Longer-term, we believe that SSDs in the Enterprise market are here to stay and will grow to become a very significant market within the next five years. Further, we believe that as this market grows, there will be room for a few additional players and that STEC will remain the dominate player in Enterprise-class SSDs."

89.   Defendant Manouch Moshayedi also began to disclose STEC's reliance on EMC, revealing to investors that "EMC still remains our top customer," and that "most of our ZeusIOPS is done through EMC," with 90% coming from EMC.

Defendant Manouch Moshayedi further explained that:

SSD as a whole is here to stay. It's going to grow quarter after quarter, year after year, and we'll be a big part of it going forward. . . .

EMC is very much in line with our thought process that SSD is extremely important in the enterprise storage markets. So are the rest of the customers. It's just a matter of training and doing enough marketing to get the sales departments of everybody on board.

90.   Defendant Manouch Moshayedi remained adamant during the call that STEC has no competition for Zeus.   For example, an Oppenheimer analyst commented that "there's just a lot of skepticism right now around your company and its ability to compete." The analyst asked defendant Manouch Moshayedi "if there is anything you can say or do here to convince us that it's not competition, that it really is a problem with end demand in terms of SSD adoption." Manouch Moshayedi responded as follows:

What I can tell you is there is absolutely no competition. To this date, we have not seen, and nor has [EMC] seen, a product that competes with our ZeusIOPS.

So we are the only supplier of ZeusIOPS or ZeusIOPS-like SSD into enterprise storage markets today. There is not one single competitor out there.

33

If there were competitors coming in, we would estimate that they would come in somewhere around mid-2010, and if they would go qualify with a product that actually does qualify, it would be somewhere around first or second quarter of 2011. We do not foresee a competitor coming in anytime soon into this market and all of this – these reports that competition has come in are absolutely false. None of our customers are going with the competitors, and there is absolutely no competition today for our ZeusIOPS product line in any of our customers.

91.   Despite defendants' attempted reassurances, in reaction to STEC's November 3, 2009 disclosure, shares of STEC stock plunged $9.01 per share to close at $14.14 per share on November 4, 2009, wiping out another $450 million in shareholder equity. The September 17, 2009 and November 3, 2009 revelations together destroyed over $750 million in shareholder equity.

92.   A Tech Trader report, late in the day on November 3, 2009, reported that STEC's stock price was being "[w]hacked" as a result of the announcement regarding EMC's excess inventory of STEC's Zeus product.

93.   As a result of the November 3, 2009 announcement, on November 4, 2009, several analysts who had previously been bullish on STEC downgraded STEC stock.

94.   For example, Oppenheimer & Co. downgraded the stock to "Perform" from "Outperform," slashing its price target in half to $21 from $45, explaining that it had been "[p]istol-[w]hipped." Oppenheimer pointed to STEC's newly disclosed problems with selling-through Zeus at EMC and with developing new customers for Zeus, such as HP and IBM.

95.   J.P. Morgan, too, lowered its estimates and lowered its price target to $42 from $50, citing the excessive inventory and competition concerns as follows: "Excess inventory at EMC and the establishment of a new marketing incentive program to

34

524368_1

1  educate EMC sales personnel stands to fuel investors' concerns of competitive shifts

2  in the making."

3      96.   ThinkEquity LLC also cut its rating to "Hold" from "Buy," explaining

4  "We got this one wrong" and pointing in part to "competitive pressures" and

5  "inventory risk." Deutsche Bank cut its revenue, EPS estimates and price target in

6  order to reflect the slower adoption of SSDs into the enterprise market. It reported

7  that the "big announcement" on the STEC conference call was that EMC may not be

8  able to sell the entire $120 million it has committed in purchasing the second half of

9  2009, creating the potential for lower sales in first quarter 2010.

10      97.   WedBush Morgan cut its rating to "Neutral" from "Outperform" and

11  reduced its price target to $18 from $39 per share in a report entitled "Down for the

12  Count After Last Night's Blindsided Knock Out Punch." Wedbush Morgan noted that

13  although the analyst had prior concerns about STEC's competition, she was

14  "completely caught off guard" by the stall in the adoption rates of SSDs and the

15  excess inventory at EMC which STEC said could be carried into first quarter 2010.

16  Just hours earlier on that same day, but prior to STEC's startling disclosure, WedBush

17  had reiterated its "Outperform" rating for STEC and $39 price target, emphasizing

18  STEC's "strong demand for ZeusIOPS at its leading Tier 1 customer EMC."

19      98.   Needham likewise lowered its price target to $30 from $46, citing the

20  "EMC inventory overhang." Echoing the assurances by Manouch Moshayedi during

21  the earnings conference call, however, Needham indicated that the inventory issue

22  was only "temporary" and would impact only first quarter 2010.

23      99.   B. Riley & Co., LLC, too, focused on the disclosed "inventory concerns."

24  But echoing defendant Manouch Moshayedi's reassurances during the November 3,

25  2009 conference call, B. Riley & Co., LLC stated that it expected only first quarter

26  2010 would be impacted and that EMC is not giving up on STEC.

27

28

1   100.   On November 16, 2009, Seeking Alpha published an article entitled
2   "STEC Revisited: Will It Go From Good To Great?"  The article noted that the stock
3   price has plummeted after the November 3 disclosure as a result of:

4        **Concern over management integrity and credibility**:   Whether
5        management knew about the demand/inventory issue in advance or not,
6        the market found it too coincidental that top management made such a
7        substantial sale of stock in the very quarter they blew up.  At the same
8        time the potential question of integrity was being debated, they made it
9        worse in the earnings conference call by not appearing to have concrete
10       answers about the inventory at their largest customer who will generate
11       over 60% of the revenues in the second half.

12   101.   On November 17, 2009, STEC hosted an Analyst Day in New York.  As
13   reiterated by analysts such as Needham, STEC reassured analysts (and investors) of
14   the competitive landscape purportedly favoring STEC and that the EMC issue was
15   only "short-term inventory noise."

16   102.   Shortly thereafter, on December 3, 2009, STEC presented at the J.P.
17   Morgan's Mid Cap Conference in New York.  Following STEC's representations at
18   the Conference, analysts such as J.P. Morgan again reiterated that the excess inventory
19   was expected to impact only first quarter 2010.

20   103.   EMC, itself, later openly stated to analysts that the order to STEC
21   intentionally included excess inventory, not just for 2009, but also into 2010.  For
22   example, EMC explained during its January 26, 2010 earnings conference call that
23   "[w]e have good relationships with all of our suppliers," and the order with STEC for
24   excess inventory "was designed to protect ourselves going into [first quarter] against
25   what we knew would be a tight supply environment."

26   104.   On February 23, 2010, STEC further shocked the market when it stated
27   in a press release issued after the close of market trading that the inventory carry-over
28   at EMC would not only hurt STEC's first quarter 2010 revenues as previously

524368_1

1  announced in November, but that it would also negatively impact STEC's sales for the
2  entire first half of 2010, stating:

3      "We believe that the first half of 2010 will be a tough period for
4      our business due to an inventory carryover by our largest customer
5      [EMC].    Although, we believe the marketing programs that we
6      implemented last quarter have had a    positive effect on the sell-through
7      of SSDs, based on our best estimates we now anticipate this inventory
8      carryover to continue to negatively impact our sales to [EMC] during the
9      first half of 2010, as we do not expect any meaningful production orders
10     from [EMC] during that time."

11     105.   The Company also announced that it expected first quarter of 2010
12  revenue of $33 million to $35 million, contrasting sharply with the projections of
13  $79.73 million by analysts – who had relied on defendants' prior representations – and
14  vastly lower than the $106 million reported for the fourth quarter of 2009.

15     106.   During the related February 23, 2010 earnings call, Manouch Moshayedi
16  explained that the products that STEC sold to EMC in the second half of 2009 would
17  not cover EMC's inventory needs for just six months, but for an entire year, until mid-
18  2010. Also during the conference call, defendants disclosed that EMC had accounted
19  for 62% of STEC's overall revenue for the fourth quarter, but it would plummet to 0%
20  of STEC's revenue for the first half of 2010.

21     107.   STEC's February 23, 2010 disclosure related not only to EMC, but to the
22  adoption of STEC's enterprise-scale SSDs by other customers as well.  Following an
23  analyst's question regarding revenue guidance from Zeus customers other than EMC,
24  Manouch Moshayedi responded:

25     On the rest of the customers, everyone is growing very slowly,
26     however.   We are starting to implement marketing programs with
27     everyone. However, those things take at least three to six months to take

28

37

524368_1

1        hold. So, again, that is why we put second half of this year as the time to

2        see growth again in this market.

3        108.  Manouch Moshayedi also finally admitted that, contrary to his prior

4 representations during the November 3, 2009 earnings call, the joint marketing

5 program had not actually been adopted by any customer other than EMC.

6        109.  This was the first time that STEC had admitted that, contrary to

7 defendants' prior reassurances that the EMC inventory overhang would impact only

8 first quarter, it would, in fact, impact the entire first half of 2010.

9        110.  This was also the first time investors learned that STEC was so

10 substantially dependent on EMC that STEC's revenues would plummet without

11 EMC's business.  This news revealed that STEC could not "find a replacement

12 customer for the relevant product," as it had previously represented to the SEC and

13 that, also contrary to its representations to the SEC, its business *would* be

14 "fundamentally altered without a specific customer sales agreement" with EMC.  As

15 STEC's other customers remained dissatisfied with STEC's products and unable to

16 integrate STEC's products with their own, they could not compensate for the revenue

17 gap created by EMC's inventory overhang, and STEC was forced to issue guidance

18 for 1Q10 for a mere third of the prior quarter's revenue.

19        111.  These disclosures also revealed the essential failure of the joint marketing

20 program.  Manouch Moshayedi admitted during the earnings call that STEC's

21 incremental effort for sales beyond its initial customers who use short-stroking

22 techniques on HDDs had been more difficult than originally expected.  The market

23 realized that it was not sales force incentives or education that were needed, but rather

24 that the product simply did not fit end users' needs and did not provide efficient and

25 reliable performance sufficient to justify the high price tag.  As discussed during the

26 earnings call, future iterations of the product, now being worked up, might better

27 address the market's needs.  Indeed, Manouch Moshayedi admitted during the

28

524368_1

1   earnings call that "in terms of payment out [the joint marketing program] is a bit less
2   than what we had expected."

3       112.   In the Company's Form 10-K for the year ended December 31, 2009,
4   filed with the SEC on February 23, 2010, STEC reported that its board of directors
5   had authorized a stock repurchase program effective November 10, 2009 – just three
6   months after defendants Mark and Manouch Moshayedi's massive secondary offering.
7   This repurchase program allows STEC to repurchase up to $75 million of its shares at
8   their now devastated price.

9       113.   Defendants also announced in the 10-K for the first time that that they
10  were under investigation for insider trading, stating in part:

11          [T]he United States Securities and Exchange Commission ("SEC") is
12          conducting a formal investigation involving trading in our securities.
13          Certain of our officers and employees, including our CEO and President,
14          have received subpoenas in connection with this investigation.

15      114.   In reaction to this news revealed on February 23, 2010, STEC shares
16  dropped over 23% in trading on February 24, 2010, a decline of $3.15, on
17  extraordinary volume of over 36 million shares.

18      115.   Analysts immediately further reduced their ratings and price targets, and
19  expressed a "loss of confidence in STEC management."

20      116.   For example, following STEC's February 23, 2010 disclosure, on
21  February 24, 2010, WedBush reduced its 12-month price target to $10 from $14,
22  which it had set just two days earlier on February 22, 2010.  Wedbush cited the
23  "significant magnitude of the inventory over-hang" coupled with uncertain adoption
24  rates of SSDs in enterprise applications.

25      117.   Thomas Weisel Partners, too, lowered its rating on STEC to "[m]arket
26  [w]eight," noting the inventory overhang at EMC and slower adoption rate of
27  enterprise SSDs.  The analyst also expressed "*our loss of confidence in STEC*
28  *management*."

524368_1

118.   Oppenheimer, too, reset its estimates, noting that STEC had hit "[r]ock [b]ottom," and explaining that whereas the market understood the $120 million EMC deal to be indicative of a half-year run rate, it had now been disclosed that it was indicative of a full-year run rate.   Oppenheimer further explained that "EMC completely turned-off the spigot with STEC in 1Q," going from a 62% customer to 0% over one quarter. Oppenheimer therefore explained that "[a]s a result, our '10 estimate falls to its knees to $0.15 vs. our prior estimate of $2.00."

119.   Deutsche Bank, too, noted that, while the market had known since November that EMC had extra inventory of SSDs, it had understood that EMC's demand for SSDs was higher than the Company now reports in February.  Specifically regarding the $120 million deal that defendants had touted back in July 2009 just prior to their stock offering, Deutsche Bank stated that "In retrospect, the EMC volume purchase agreement did more harm than good, as a clearer read on EMC's sales would have given a better sense of where the market was trending."

120.   J.P. Morgan also downgraded the stock, citing the market's belief that STEC's greater-than-expected revenue miss also stemmed from new competition and stating that "[w]e had been too optimistic, thinking the EMC inventory overhang would be a one-quarter issue."

121.   ThinkEquity LLC too recognized that the Company's most recent announcement raised questions, including the fact that Zeus had not been able to sell through and competition was increasing.  Needham also lowered its estimates, citing the Company's lowered guidance as "a clear result of excess inventory and slower adoption."

122.   On March 14, 2010, The Register published an article by Chris Mellor entitled: "Is EMC looking away from STEC?" containing quotes from EMC's PR Director, Rick Lacroix, stating: "We have a multiple supplier strategy for components [and] we've never positioned our relationship with STEC as exclusive. . . . [W]e prefer a multiple supplier arrangement."

40

524368_1

123.   When asked whether EMC is qualifying a second supplier for its SSDs, EMC responded: "We can't provide any details about this [but] we prefer a multiple supplier arrangement."

The March 14, 2010 article further explained as follows:

Second-sourcing [by EMC] would be a lever to force STEC's prices down, as well as ensuring continuity of supply if one vendor experienced production difficulties.  If, by the mid-year point[,] EMC orders had still not picked up, STEC would be desperate to get an EMC order.  Then let EMC drop the bombshell that, er, yes, it actually had a second source whose product was 30 per cent cheaper and, unless STEC adjusted its pricing, EMC would prefer to order product from the second vendor.

If this happens, and the other STEC Zeus customers follow suit – and why wouldn't they, second-sourcing being normal – then Zeus revenues take a heavy hit.

Join these dots up and the picture revealed is that STEC's good times with its Zeus SSD product are over.  Other vendors are not taking up the Zeus slack from EMC, and indeed, two of them have rejected Zeus all together.  EMC itself is highly-likely to find a second source, and Zeus prices will then just have to come down.

124.   In sum, as detailed above, STEC suffered economic loss as a direct result of defendants' breaches of their fiduciary duties to STEC and its shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.   Plaintiffs incorporate ¶¶1-124.

126.   Plaintiffs bring this action derivatively in the right of STEC and on behalf of STEC to redress injuries suffered, and to be suffered, by STEC as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of

41

524368_1

1  corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by

2  the defendants.

3      127.  Plaintiffs will adequately and fairly represent the interests of STEC in

4  enforcing and prosecuting its rights.

5      128.  Plaintiffs are and were owners of STEC stock at all times relevant to the

6  wrongful course of conduct alleged herein, and remain shareholders of the Company.

7      129.  As of the date this Complaint was filed, the STEC Board consisted of

8  seven (7) directors: Manouch Moshayedi, Mark Moshayedi, Moses, Witte, Bahri, Ball

9  and Colpitts.

10      130.  Plaintiffs have not made a demand on the present Board of STEC to

11  institute this action because such a demand would have been a futile, wasteful and

12  useless act, particularly for the following reasons:

13          (a)    Any suit by the current directors of STEC to remedy the wrongs

14  complained of herein would expose defendants themselves and their friends and

15  business allies to significant personal liability for their breaches of fiduciary duties

16  and other misconduct. The defendants have demonstrated their unwillingness and/or

17  inability to act in compliance with their fiduciary obligations an/or to sue themselves

18  and/or their fellow directors for the wrongful conduct described herein. Each of the

19  defendants are accused of wrongdoing and recommending, approving and signing the

20  Registration Statement, and thus, face a substantial likelihood of liability, thereby

21  rendering any demand upon them futile.

22          (b)    Defendants were aware of and participated in and approved of the

23  wrongs alleged herein. Thus, defendants have knowingly chosen not to exercise the

24  fiduciary duties of loyalty and due care owed to the Company, and to protect STEC or

25  to rectify the illegal practices complained of herein. Defendants therefore have

26  approved of and continue to participate in a course of corporate misconduct that

27  includes the following:

28

524368_1

42

1           (i)      Defendants were involved in approving and/or condoning

2    the illegal conduct and practices described herein.  Each defendant had the ability

3    and/or opportunity to prevent these practices.  The Board is responsible for overseeing

4    the Company's compliance with legal requirements and, therefore, all directors are

5    liable for not ensuring that the officers and employees of the Company did not expose

6    the Company to unnecessary risk.  Because defendants are liable for approving and

7    directing the illegal conduct described herein, demand would be futile.

8           (ii)     As alleged above, defendant Manouch Moshayedi breached

9    his fiduciary duties of loyalty and good faith by making improper statements

10   regarding STEC's customers, competition, and business prospects.  As a result,

11   Manouch Moshayedi faces a sufficiently substantial likelihood of liability for his

12   breach of fiduciary duty.  Accordingly, demand is futile as to defendant Manouch

13   Moshayedi.

14          (iii)    The principal professional occupation of defendant Manouch

15   Moshayedi is his employment with STEC, pursuant to which he received and

16   continues to receive substantial monetary compensation and other benefits.

17   Specifically, STEC paid defendant Manouch Moshayedi the following compensation:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Totals |
|---|---|---|---|---|---|
| 2008 | $515,000 | $584,284 | $249,947 | $65,651 | $1,414,882 |
| 2009 | $515,000 | $1,242,000 | $772,500 | $63,357 | $2,592,857 |

21          (iv)    Accordingly, defendant Manouch Moshayedi is incapable of

22   impartially considering a demand to commence and vigorously prosecute this action

23   because he has an interest in maintaining his principal occupation and the substantial

24   compensation he receives in connection with that occupation.  Demand is futile as to

25   defendant Manouch Moshayedi.

26          (v)     The principal professional occupation of defendant Mark

27   Moshayedi is his employment with STEC, pursuant to which he received and

28

524368_1

continues to receive substantial monetary compensation and other benefits. Specifically, STEC paid defendant Mark Moshayedi the following compensation:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2008 | $455,000 | $256,784 | $110,413 | $73,798 | $  895,995 |
| 2009 | $455,000 | $621,000 | $273,000 | $67,038 | $1,416,038 |

(vi)      Accordingly, defendant Mark Moshayedi is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Mark Moshayedi.

(vii)      During the times complained of, defendants Manouch Moshayedi and Mark Moshayedi sold STEC stock under highly suspicious circumstances as alleged above in ¶¶41-53.  In particular, defendants Manouch Moshayedi and Mark Moshayedi sold nine million STEC shares for proceeds of approximately $267 million.  Accordingly, these defendants face a substantial likelihood of liability for breach of their fiduciary duty of loyalty. Any demand upon these defendants is futile.

(viii)      Defendants Manouch Moshayedi and Mark Moshayedi are brothers and have numerous business relationships with each other. Because of these relationships, defendants Manouch Moshayedi and Mark Moshayedi will not take action against each other as to the claims asserted herein. Accordingly, any demand upon these defendants is futile.

(ix)      Defendant Colpitts is also interested and lacks independence from other interested directors. Colpitts is the Managing Director and Global Head of Technology Investment Banking at Deutsche Bank. Deutsche Bank was one of the managers of the secondary offering where defendants Mark Moshayedi and Manouch Moshayedi collectively sold $279 million worth of STEC stock. Deutsche Bank, as

44

524368_1

1   an underwriter of the secondary offering, benefitted materially for its role in the
2   secondary offering, receiving more than $3.6 million in fees.  Because of his firm's
3   potential liability in the Securities Action, Defendant Colpitts faces a clear conflict of
4   interest between his duties as a Board member and his professional duty to Deutsche
5   Bank as a senior executive and Managing Director/Global Head of Technology
6   Investment.  Accordingly, any demand upon Colpitts is futile;

7          (x)      Defendant Moses is interested and he lacks independence
8   from other interested directors.  Moses is the former head of the Audit Committee and
9   a former CFO of the Company.  From his long, lucrative professional and personal
10  association with other directors, including, but not limited to, Mark Moshayedi and
11  Manouch Moshayedi, Moses cannot independently and disinterestedly consider a
12  demand upon the Board.  In addition, prior to defendant Moses' employment with
13  STEC, he was a senior PriceWaterhouseCoopers ("PwC") auditor.  PwC is, and has
14  been, the Company's auditor for at least the past ten years creating an additional
15  conflict due to Moses' personal and professional ties with his past employer.
16  Accordingly, any demand upon Moses is futile.

17          (xi)     Defendants Manouch Moshayedi, Mark Moshayedi, Moses,
18  Witte, Bahri, Ball and Colpitts each signed the false and misleading Registration
19  Statement for the August 2009 public offering.  By signing the materially false and
20  misleading Registration Statement, defendants violated their fiduciary duties of
21  loyalty and candor to shareholders.  Defendants' signatures on the false and
22  misleading Registration Statement also violated federal securities laws, *i.e.* the
23  Securities Exchange Act of 1934 and the Securities Act of 1933.  Indeed, these
24  defendants were complicit in the creation and/or authorization of the Registration
25  Statement that was designed for the sole benefit of the Moshayedi Defendants and
26  which has led to an SEC investigation into the trades associated with the so-called
27  "Secondary Offering."  Accordingly, these defendants face a substantial likelihood of
28  liability and any demand upon them is excused.

524368_1

1    (xii)    Defendants Witte, Bahri, and Ball serve on the Audit
2  Committee. Members of the Audit Committee, because of their position of control
3  and authority over STEC, were able to, and did, directly and indirectly, control the
4  wrongful acts complained of herein. The members of the Audit Committee failed to
5  ensure that the Company had and maintained adequate internal financial controls and
6  failed to ensure the integrity of the Company's financial statements, including those in
7  the Registration Statement and other financial statements incorporated by reference
8  therein. Because members of the Audit Committee had an affirmative duty to ensure
9  that the Company maintained adequate internal controls over financial reporting and
10  the integrity of the Company's financial statements and failed to do so, members of
11  the Audit Committee breached their fiduciary obligations due the Company.
12  Accordingly, the Audit Committee defendants – Witte, Bahri, and Ball – could not
13  impartially respond to a demand and it would have been futile.

14    (xiii)    Defendants Bahri, Ball and Witte are also interested because
15  they face a substantial likelihood of liability for their conduct on the Compensation
16  Committee. Pursuant to the Compensation Committee Charter, Bahri, Ball and Witte
17  were and are responsible for determining the appropriate compensation for the
18  Company's executive officers. In the Company's most recent Proxy Statement dated
19  April 16, 2010 ("2010 Proxy Statement"), Bahri, Ball and Witte report that they
20  approved 2009 cash and bonus compensation to Manouch Moshayedi, Mark
21  Moshayedi and Raymond Cook because they "achieved all of their individual
22  performance objectives." The Compensation Committee reports in the 2010 Proxy
23  Statement that Manouch Moshayedi's 2009 individual performance goals included
24  "gross profit improvement." Mark Moshayedi's 2009 individual performance goals
25  included "increased revenue from SSD product lines" and "new Zeus IOPS product
26  introduction." Cook's individual performance goals included "no material weakness
27  and no more than one significant deficiency" in the "year-end internal control review
28  for the U.S. and Malaysia." Manouch Moshayedi's 2009 Base Salary was $515,000

524368_1

1  and he received a bonus of $772,500, as approved by the Compensation Committee.
2  Mark Moshayedi's 2009 Base Salary was $455,000 and he received a bonus of
3  $273,000, as approved by the Compensation Committee. Cook's Base Salary was
4  $250,000 and he received a bonus of $150,000, as approved by the Compensation
5  Committee. Given the extreme failure to increase SSD sales (and thus gross profit)
6  and misrepresentations concerning ZeusIOPS, as alleged herein, it was a breach of
7  fiduciary duties for the Compensation Committee to approve the compensation and
8  Bahri, Ball and Witte face a substantial likelihood of liability. In light of the facts
9  alleged herein, there is reason to doubt that Bahri, Ball and Witte would investigate
10 and sue the very same officers that they just awarded lucrative bonuses to because
11 they supposedly met all "individual performance goals" for in 2009. Thus, in light of
12 the facts alleged herein, there is reason to doubt Bahri, Ball and Witte's independence
13 and/or business judgment. Accordingly, demand upon Bahri, Ball and Witte is futile.
14         (xiv)    Defendants' illegal conduct is not subject to business
15 judgment protection or subject to ratification.
16         (xv)    The wrongful conduct complained of herein by defendants
17 amounted to breaches of their fiduciary duties of candor, good faith, and loyalty to
18 STEC and its shareholders.
19         (xvi)    Defendants, and in particular, the members of the Audit
20 Committee, refused to put into place adequate internal controls and adequate means of
21 supervision to stop the wrongful conduct alleged herein despite the fact that the Board
22 knew and/or recklessly ignored such wrongful business practices. These acts, and the
23 acts alleged in this action, demonstrate a pattern of gross misconduct, which conduct
24 is not taken honestly and in good faith.
25         (xvii)    Moreover, despite defendants having knowledge of the
26 claims raised by plaintiffs, the current Board has failed and refused to seek to recover
27 for STEC for any of the wrongdoing alleged by plaintiffs herein.
28

524368_1

## COUNT I

### Against Defendants for Breach of Fiduciary Duty

131. Plaintiffs incorporate ¶¶1-130.

132. Defendants owed and owe STEC fiduciary obligations. By reason of their fiduciary relationships, defendants owed and owe STEC the highest obligation of good faith, fair dealing, loyalty and due care and diligence in the management of the Company.

133. Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision. They have each also been responsible for the gross and reckless management of STEC and ignored their fiduciary responsibilities by causing the Company to engage in unlawful conduct described herein.

134. Defendants engaged in the above conduct in intentional breach of their fiduciary duties to the Company.

135. Defendants conspired to abuse, and did abuse, their positions of control and oversight at STEC.

136. As a direct and proximate result of defendants' failures to perform their fiduciary obligations, STEC has sustained significant damages. Plaintiffs, as shareholders and representatives of the Company, seek damages and other relief for the Company.

## COUNT II

### Against Defendants for Abuse of Control

137. Plaintiffs incorporate ¶¶1-136.

138. Defendants' misconduct alleged herein constitutes a breach of their fiduciary duties because they abused their ability to control and influence STEC, for which they are legally responsible.

139. As a direct and proximate result of defendants' abuse of control, STEC has sustained significant damages.

48

524368_1

140.   As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### Against Defendants for Gross Mismanagement

141.   Plaintiffs incorporate ¶¶1-140.

142.   By their actions alleged herein, defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of STEC in a manner consistent with the operations of a publicly held corporation.

143.   As a direct and proximate result of defendants' gross mismanagement and breaches of duty alleged herein, STEC has sustained significant damages.

144.   As a result of the misconduct and breaches of duty alleged herein, defendants are liable to the Company.

## COUNT IV

### Against Defendants for Waste of Corporate Assets

145.   Plaintiffs incorporate ¶¶1-144.

146.   As a result of the improper conduct described herein, and by failing to properly consider the interests of the Company and its public shareholders and by refusing to conduct proper supervision, defendants have caused STEC to waste valuable corporate assets and incur costs to defend defendants' unlawful actions.

147.   As a result of the waste of corporate assets, defendants are liable to the Company.

## COUNT V

### Against Defendants for Unjust Enrichment

148.   Plaintiffs incorporate ¶¶1-147.

149.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of, and to the detriment of, STEC.

524368_1

49

150.   Plaintiffs, as shareholders and representatives of STEC, seek restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT VI**

**Against Defendants Manouch Moshayedi and Mark Moshayedi for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

151.   Plaintiffs incorporate ¶¶1-150.

152.   At the time of the stock sales set forth herein, defendants Manouch Moshayedi and Mark Moshayedi (the "Insider Selling Defendants") knew the information described above, and sold STEC common stock on the basis of such information.

153.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold STEC common stock.

154.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's competitive position and prospects were not as represented.  The Insider Selling Defendants' sales of STEC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

155.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

524368_1

50

1      A.     Against defendants and in favor of the Company for the amount of
2  damages sustained by the Company as a result of defendants' breaches of fiduciary
3  duties, abuse of control, gross mismanagement, waste of corporate assets, unjust
4  enrichment, aiding and abetting breaches of fiduciary duties, and insider trading;

5      B.     Directing STEC to take all necessary actions to reform and improve its
6  corporate governance and internal procedures to comply with applicable laws and to
7  protect STEC and its shareholders from a repeat of the damaging events described
8  herein;

9      C.     Extraordinary equitable and/or injunctive relief as permitted by law,
10  equity and state statutory provisions sued hereunder, including attaching, impounding
11  and imposing a constructive trust on or otherwise restricting the proceeds of
12  defendants' trading activities or their other assets so as to assure that plaintiffs on
13  behalf of STEC has an effective remedy;

14      D.     Awarding to STEC restitution from defendants, and each of them,
15  including ordering disgorgement of all profits, benefits and other compensation
16  obtained by defendants;

17      E.     Awarding plaintiffs the costs and disbursements of the action, including
18  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

19      F.     Granting such other and further relief as the Court deems just and proper.

20                     **JURY DEMAND**

21      Plaintiffs demand a trial by jury.

22  DATED: May 28, 2010         ROBBINS GELLER RUDMAN
                                        &amp; DOWD LLP
23                              DARREN J. ROBBINS
                              TRAVIS E. DOWNS III
24                              BENNY C. GOODMAN III

25

26                              BENNY C. GOODMAN III

27

28                                               51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

GLANCY BINKOW & GOLDBERG LLP
MICHAEL GOLDBERG
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)

Lead Counsel for Plaintiffs

524368_1

1

## DECLARATION OF SERVICE BY E-MAIL

2      I, Deborah D. Hayes , not a party to the within action, hereby declare that on
May 28, 2010, I served the attached CONSOLIDATED VERIFIED DERIVATIVE

3  COMPLAINT FOR BREACH OF FIDUCIARY DUTY on the parties in the within
action by e-mail addressed as follows:

4

### COUNSEL FOR PLAINTIFFS:

5

| NAME | FIRM | EMAIL |
|------|------|-------|
| Joe Kendall | Kendall Law Group | jkendall@kendalllawgroup.com |

6

7

### COUNSEL FOR DEFENDANTS:

8

9

| NAME | FIRM | EMAIL |
|------|------|-------|
| Patrick E. Gibbs | Latham & Watkins LLP | patrick.gibbs@lw.com |
| Carolyn A. Dawes | Latham & Watkins LLP | carolyn.dawes@lw.com |
| Michele D. Johnson | Latham & Watkins LLP | michele.johnson@lw.com |
| Christopher W. Johnstone | Latham & Watkins LLP | chris.johnstone@lw.com |

10

11

12

13

14

DEBORAH D. HAYES

15

16

17

18

19

20

21

22

23

24

25

26

27

28

524368_1

**VERIFICATION**

I, Marlyn J. Spear, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge and belief.

DATED: May 27, 2010

_Marlyn J. Spear_
MARLYN J. SPEAR

-54-